NO. 09-3195

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,
Appellee

v.

WILLIAM KING,
Appellant

---

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 08-066 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

---

MICHAEL L. LEVY
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

BEA L. WITZLEBEN
MAUREEN MCCARTNEY
Assistant United States Attorneys

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8680

## TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER JURISDICTION. . . . . . . . . 1

STATEMENT OF APPELLATE JURISDICTION.. . . . . . . . . . . 2

STATEMENT OF ISSUES.. . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF RELATED CASES. . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 23

    I.   THE DEFENDANT'S INEFFECTIVE ASSISTANCE
        CLAIM IS NOT RIPE FOR CONSIDERATION ON
        DIRECT APPEAL. . . . . . . . . . . . . . . . . 23

    II.  IN LIGHT OF THE POOR QUALITY OF THE
        EVIDENCE SUPPORTING SUPPRESSION OF THE
        COMPUTER EVIDENCE AND THE OVERWHELMING
        EVIDENCE OF GUILT WHICH IS INDEPENDENT
        OF THE COMPUTER EVIDENCE, THE DEFENDANT
        CANNOT BE SAID TO HAVE SUFFERED PREJUDICE
        FROM THE ADMISSION OF THE COMPUTER EVIDENCE. . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . 41

## TABLE OF AUTHORITIES

### Cases

**Deputy v. Taylor**,
        19 F.3d 1485 (3d Cir. 1994). . . . . . . . . . . 33

**Massaro v. United States**,
        538 U.S. 500 (2003). . . . . . . . . . . 21, 23, 24

**Strickland v. Washington**,
        466 U.S. 668 (1984). . . . . . . . . . . . . passim

**Thomas v. Varner**,
        428 F.3d 491 (3d Cir. 2005). . . . . . . . . . . 22

**United States v. Crandell**,
        554 F.3d 79 (3rd Cir. 2009). . . . . . . . . . . 35

**United States v. Giberson**,
        527 F.3d 882 (9th Cir 2008). . . . . . . . . . . 25

**United States v. Headley**,
        923 F.2d 1079 (3d Cir. 1991). . . . . . . . 21, 23

**United States v. Jake**,
        281 F.3d 123 (3d Cir. 2002). . . . . . . . . . . 24

**United States v. Sanders**,
        165 F.3d 248 (3d Cir. 1999). . . . . . . . . . . 30

**United States v. Thornton**,
        327 F.3d 268 (3d Cir. 2003). . . . . . . . . passim

**United States v. Wilson**,
        413 F.3d 382 (3d Cir. 2005). . . . . . . . . . . 36

## **Statutes and Rules**

18 U.S.C. § 1038. . . . . . . . . . . . . . . . . . . . . . . **4**

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . **4**

18 U.S.C. § 1347. . . . . . . . . . . . . . . . . . . . . . . **4**

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . **1**

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . **2**

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . **23, 24**

## STATEMENT OF SUBJECT MATTER JURISDICTION

Because the defendant was charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## STATEMENT OF APPELLATE JURISDICTION

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on July 27, 2009, against appellant/defendant William King, the Court has jurisdiction over this matter under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.  Is the defendant's claim that his trial counsel was ineffective for failing to move to suppress the evidence from the search of the defendant's computers ripe for review on direct appeal, where the record is incomplete as to what reasons, if any, trial counsel had for not making such a motion?

2.  Even if the issue of ineffectiveness were ripe on direct appeal, and even if defendant's trial counsel should have moved to suppress the computer evidence, can the defendant establish that he was prejudiced where the record suggests that the evidence would not have been suppressed, and where evidence of the defendant's guilt independent of the computer evidence was overwhelming?

## STATEMENT OF THE CASE

On February 5, 2008, a grand jury sitting in the Eastern District of Pennsylvania returned an indictment of defendant/appellant William King, charging him with 13 counts of mail fraud, in violation of 18 U.S.C. § 1341, 59 counts of health care fraud, in violation of 18 U.S.C. § 1347, and ten counts of false statements in a health care matter, in violation of 18 U.S.C. § 1038.  The mail and health care fraud charges were based on King's submission of claims to an insurance company that were fraudulent because they were either billed as a more extensive service than he actually provided ("upcoded") or billed as visits when in fact the patient had not been seen that day ("ghost visits").  The false statement charges were based on King's fabrication of false medical records for ten patients whose records he was required to submit to the insurance company during an audit.

Prior to trial, King filed a motion to suppress the statements he had made to the FBI, and a motion to dismiss the indictment (on timeliness grounds).  Addendum to App. 10.  The district court denied both motions.  Id.  King

-4-

proceeded to trial.  On October 15, 2008, following a seven-day trial, the jury found King guilty of all 82 counts of the indictment.  The jury also ordered forfeiture in the amount of $639,578.

On July 24, 2009, the district court imposed a sentence of 36 months' imprisonment to run concurrently on each count of conviction, a term of three years' supervised release, restitution in the amount of $780,151, a fine of $12,500, and special assessments in the amount of $8,200. King filed a timely appeal.

## STATEMENT OF FACTS

Defendant/appellant King was employed by the
Health and Welfare Clinic located at 3001 Walnut Street,
Philadelphia, Pennsylvania, to provide gynecological
services for members of Local 33, a collective of labor
unions that represented the blue-collar workers of the City
of Philadelphia.  Supp. App. 591, 597.  From 1999 through
2003, the defendant, like all specialists at the clinic,
submitted his billing claims to Independence Blue Cross
(Blue Cross), the insurance company that had the contract
with Local 33.  Supp. App. 419-26, 598.

When submitting a claim for payment to Blue Cross,
physicians were required to complete a HCFA 1500 form.
Supp. App. 431.  The 1500 form contains, among other things,
biographical information on the patient, date of treatment,
the physician's diagnosis, and a Current Procedural
Terminology Code (CPT code).  Supp. App. 431-34.  A CPT code
is a standard code which is used to describe the type of
service that was rendered.  Supp. App. 434.  The CPT code
determines the amount of payment a physician receives.
Supp. App. 437.  The defendant received information from

-6-

Blue Cross about how much each CPT code paid.  Supp. App.
437-61.

During 2003, Blue Cross began to utilize a data
mining program called the Service Tracking Analysis
Reporting System (STARS).  Supp. App. 373-75.  This program
was developed so that Blue Cross would have the ability to
detect and track abuse and fraud.  Supp. App. 375-76.  Using
STARS, Blue Cross reviewed utilization for physicians using
CPT code 99245 in 2003.  Supp. App. 379.  CPT code 99245,
which generates a higher payment than many other codes,
indicates that the billing physician has performed a high
level "consultation."  Supp. App. 985-87.

In order for a visit to qualify as a consultation,
the billing physician must have received a request from
another physician seeking that doctor's advice and opinion
with regard to a patient.  Supp. App. 294, 988, 993-94.  The
request for the consultation from the requesting physician
must be documented in the patient's medical record.  Supp.
App. 985-87.  The consultant physician's opinion and any
services provided must also be documented in the patient's

-7-

medical record and communicated by written report to the requesting physician.  Supp. App. 985-88.

Additionally, in order to bill for a high-level consultation, falling within code 99245, the physician must take a comprehensive history of the patient, must do a comprehensive examination of the patient, and must engage in medical decision-making of high complexity.  Supp. App. 989-93.  It is expected that the physician spend 80 minutes with the patient.  Supp. App. 993.

The analysis run by Blue Cross revealed that King, with very few exceptions, billed CPT code 99245 for every patient visit.  Supp. App. 380-402, 1174-76, and 1-201 (gov't exh. 4C, consisting of a list of defendant's billing to Blue Cross with non-99245 codes highlighted).  Further analysis showed that his use of the code far exceeded that of any of his peers, including doctors who were part of large gynecological practices.  Supp. App. 380-402.  STARS utilization runs for years 1999 through 2002 showed similar results.  Supp. App. 380-402.

As a result of the data generated, Blue Cross exercised its right to conduct an audit.  Supp. App. 279-80.

-8-

It wrote the defendant and requested that he make available for inspection the medical records and billing documents for 40 patients. Supp. App. 279-82. King, and his wife, who represented herself as his office manager, requested that Blue Cross postpone the scheduled audit and also limit the review to ten files. Supp. App. 282-84, 327-28. Both of these requests were granted. Supp. App. 327-28.

On June 29, 2004, three Blue Cross auditors, all of whom had nursing backgrounds, went to the defendant's office to conduct the audit. Supp. App. 328-29, 356-63. King and his wife were present and provided originals and copies of the records for ten patients. Supp. App. 284-89 and 329-32. Mrs. King explained to the auditors that she and the defendant had decided to use CPT code 99245 almost exclusively because, after consulting a manual, they had determined that that code best represented the type of visit that the defendant had with his patients. Supp. App. 288 and 331. She further explained that she would receive paperwork from the defendant that contained the patient's name, Social Security number, payroll number and a diagnosis. Supp. App. 288. If the paperwork did not

-9-

contain a diagnosis, she would call the defendant and he would provide her with a diagnosis.  Id.  Using that information, Mrs. King performed the billing.  Supp. App. 1063.

The three auditors proceeded to conduct a page-by-page comparison of the copied records with the original records.  Supp. App. 289, 358.  The medical records provided by Dr. King contained a three-page medical record for each examination date.  Supp. App. 1082.  All three of the auditors immediately noticed that the documents purporting to be the original medical records appeared to contain only one person's writing and looked to be in unusually pristine condition.  Supp. App. 290, 332, 360-61.  Due to the concerns raised by the appearance of the records, the auditors requested that the defendant provide the original medical file of one of the remaining 30 patients originally requested.  Supp. App. 292-93, 338-39.  The defendant and his wife refused, citing concerns over HIPAA privacy rules and claiming that the requested records were in Baltimore.  Supp. App. 293, 336-37, 363.

Once the auditors were back at Blue Cross with the copies that the defendant had produced, the auditors noted that none of the files contained the necessary documentation required to bill CPT code 99245.  Supp. App. 293-94.  Blue Cross then requested that King produce the additional 30 records originally requested.  Supp. App. 296-300.  When King attempted to delay production of those 30 files, the case was referred to the investigative division of Blue Cross.  Supp. App. 300-02.

On August 14, 2008, two Blue Cross investigators went unannounced to King's office.  Supp. App. 503-505, 525, 526-27.  King initially attempted to avoid the investigators, but eventually did speak to them.  Supp. App. 505-08.  The investigators requested three patient records that had not been among the originally requested 40 files.  Supp. App. 511, 513.  King provided two patient files, explaining that he was unfamiliar with the third patient, despite having billed Blue Cross 28 times for that patient.  Supp. App. 513-14.  A comparison of the two produced patient files with the ten patient files produced at the audit revealed substantial differences.  Supp. App. 520-21.

-11-

Unlike the files given to the auditors which contained a three-page medical record for each date of service, the two files obtained by the investigators contained a single-page medical record for each date of service.  Id.

Ultimately, Blue Cross referred the case to the Federal Bureau of Investigation (FBI) and provided it with numerous documents related to King's billing practices. Supp. App. 1172-73.  FBI Special Agent David Bole and United States Postal Inspector Theresa Ryan were assigned to the case.  Supp. App. 1054, 1172.

On February 18, 2005, federal search warrants were executed at the defendant's medical office in Philadelphia and at his home in Baltimore, Maryland.  App. Vol. II 25; Supp. App. 1176.  The warrants authorized, among other items, the seizure of medical files and billing documents. App. Vol. II 17-19, 27.

Inspector Ryan was one of the agents leading the search of the Kings' home in Maryland.  Supp. App. 1056-57. When agents first knocked on the Kings' door, they got no response.  Supp. App. 1058.  Once the defendant called her, however, Mrs. King answered the door.  Id.  At the outset of

their encounter, Inspector Ryan showed Mrs. King a copy of
the search warrant.  Id.  Mrs. King then showed the agents
where relevant records were kept.  Supp. App. 1059.  When
the agents observed computers in the house, Mrs. King told
the agents that the computers had billing records on them.
Supp. App. 1059.  The agents then asked Mrs. King for her
consent for them to copy the computers, which she gave.
Supp. App. 1059-60, App. Vol. II 20-23 (signed Consent Forms
to Search Computers).  Mrs. King also agreed to be
interviewed.  Supp. App. 1059-60.

Subsequently, once the defendant had arrived on
the premises, Mrs. King became less cooperative.  Supp. App.
1121.  At that point, Mrs. King refused to sign the
inventory receipts for what the agents were taking, except
for the receipt for the computer that could not be copied on
site.  App. Vol. II 34-35, 43; Supp. App. 1122, 202-11
(gov't exh. 33, consisting of property receipts marked
"refused to sign" except for last page).  FBI computer
specialist Justin Price, who was present at the search, made
an on-site forensic copy of four of the computers' hard

drives and an off-site copy of the fifth.  App. Vol. II 77-79.

At trial, on direct examination, Mrs. King testified that she had been shown a document that she believed was a search warrant, and that, based on her review of that document, she agreed to "let [the agents] search my home and to search my computers."  Supp. App. 1282.  On cross-examination, asked whether she had, in fact, signed consent forms to permit the search of the computers, Mrs. King claimed that she had been "tricked" into giving consent by being told that the consent form was necessary "for inventory purposes."  Supp. App. 1331-32.  Inspector Ryan denied having tricked or deceived Mrs. King.  Supp. App. 1124-25.

Evidence presented at trial showed that the defendant had knowledge of the requirements of CPT code 99245.  Supp. App. 288, 331, 979-97, 1095, 1180.  Mrs. King told the Blue Cross auditors and Inspector Ryan that she and her husband had consulted a manual and decided that CPT code 99245 best represented the type of visit that the defendant had with his patients.  Supp. App. 288, 330-31, 1063.  A

1999 CPT Coding Manual, which contained descriptions of the services and codes, was recovered from the King home during the execution of the search warrant.  Supp. App. 1095-96.

The defendant himself told Agent Bole that he decided to use CPT code 99245 because he did a thorough examination of each patient that generally lasted an hour. Supp. App. 1180.  When his former nurse and mistress told the defendant that she had been contacted by the FBI, the defendant tried to convince this witness to lie and say that he spent an hour with each patient.  Supp. App. 572-75.

Dr. King attended a CPT training class at Temple University where Marilyn Chew, a certified CPT coder, provided a lecture and written materials on how to properly code and bill.  Supp. App. 979-97.  This lecture specifically included discussion of billing for "consultations" and CPT code 99245.  Supp. App. 984-95.

By billing every office visit as a high-level consultation, between October 1999 and November 2003 King made $639,578 more than he would have if he had billed every visit - after the first one for each patient - as a mid-level office visit.  Supp. App. 847, 855, 862.

-15-

Not one of the approximately 2,000 patient files
seized from the defendant's medical office contained the
documentation necessary to support billing for a high-level
consultation.  Supp. App. 1082, 1192-93, 1196.  Several
nurses and patients testified that the issues presented by
the patients were not, as a general rule, complex, that
sometimes patients received birth control injections and did
not see the defendant, and that the defendant generally
spent only 15-20 minutes with each patient.  Supp. App. 572,
629, 691, 737, 1034.  Billing records showed that on 36
separate occasions between 1999 and 2003, King billed code
99245 for more than 20 patients in a single day.  Supp. App.
1117.

King also submitted claims to Blue Cross for
visits that had never occurred, or "ghost visits."  Supp.
App. 1210-26.  Patients seen by the defendant at the clinic
were asked to present both a clinic card and an insurance
card which were imprinted on a "patient information sheet"
that the patient filled out.  Supp. App. 217, 540, 645-53.
The patient was also asked to sign an insurance "referral
form."  Supp. App. 219, 543, 645-53.  A nurse would then

-16-

complete the top portion of a one-page medical record,
recording information such as age, weight, blood pressure
and pulse.  Supp. App. 215 (example of actual one-page
medical record), 537-40, 645-49.  King, after completing the
examination, would note the results on the bottom portion of
the medical record.  Supp. App. 539-40.

The defendant would take the patient information
sheet and the insurance referral forms with him at the end
of the day.  Supp. App. 544-46.  The medical record would
remain in the patient's chart.  Supp. App. 545.  Billing
documents seized from the defendant's home contained three
forms for every date of service - the HCFA 1500, the patient
information sheet, and the insurance referral form.  Supp.
App. 1065.

The billing documents for the 31 patients listed
in the indictment showed that between 1999 and 2003, King
submitted 690 claims for those patients.  Supp. App. 1225.
No corresponding medical record existed for 100 of those
claims.  Supp. App. 1225.  Also, for those 100 claims for
which there was no medical record, there was no imprint of
either a clinic card or insurance card on the billing

-17-

documents that was specific to the patient, and there was no signature of the patient on the insurance referral form. Supp. App. 1211.  Instead, the words "signature on file" were written on the referral form.  Id.  Twenty-four patients testified that they had not written on the patient information sheet, nor had they written "signature on file" on the insurance referral form for specific visits that were billed to Blue Cross in their names.  Supp. App. 707-843, 863-93, 917-67, 1027-52.

Not one of the thousands of medical records seized from the defendant's office contained three pages; instead each contained a single page medical record for each date of service.  Supp. App. 1192.  Nurses who worked for the defendant testified that the true medical records were one page long and contained handwriting in addition to the defendant's.  Supp. App. 539-40, 646-47, 693-94.  They also testified that the three-page records provided by the defendant to the auditors were not used in the medical practice, although they identified the writing and the signature on them as the defendant's.  Supp. App. 654-55, 697-98, 791-93 (sample of 3-page medical record).

-18-

Several patients testified that the information recorded in the three-page records contained history and treatment information for them that was false. Supp. App. 720, 736-37, 816. Dr. Franklin, an ob/gyn who shared office space with the defendant, denied ever having seen a three-page medical record in use at the clinic. Supp. App. 909-10.

FBI computer specialist Price testified that on a computer seized from the defendant's home, he found documents that matched the typed versions of each of the three pages that made up the three-page form that the defendant provided to Blue Cross. App. Vol. II 88-95. Those documents were created on June 6, 2004. App. Vol. II 88-91; Supp. App. 220-23 (gov't exhs. 90A, 91A, 92A & 100A, consisting of pages found on the computer with "metadata").

## STATEMENT OF RELATED CASES

The government is not aware of any other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## SUMMARY OF ARGUMENT

1.  The defendant's claim that his trial counsel was constitutionally ineffective for failing to move to suppress certain evidence is not ripe for consideration on direct appeal.  The proper avenue for pursuing claims of ineffective assistance of counsel is through a collateral proceeding, in which the factual basis for the claims can be developed.  Massaro v. United States, 538 U.S. 500 (2003); United States v. Thornton, 327 F.3d 268, 271-72 (3d Cir. 2003).  Only when an evidentiary hearing is not necessary is it appropriate to pursue such a claim on direct appeal, United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991), and that is not the case in this matter, where the record is totally devoid of information necessary to resolve the question whether defense trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984).

2.  The defendant's argument that his trial counsel was constitutionally ineffective also fails on the merits because he cannot establish prejudice, as required.

-21-

Strickland, 466 U.S. at 687.  The defendant cannot show that a motion to suppress would have been successful, and therefore he cannot show that he was prejudiced by his trial counsel's failure to make that motion.  Moreover, because the record below makes clear that the defendant would have been convicted even without the evidence which he now seeks to suppress, he cannot show prejudice from his trial counsel's failure to try to suppress that evidence.  Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005) (defendant alleging ineffective assistance of counsel for failure to file motion to suppress must demonstrate that he would likely have prevailed on such a motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted).

**ARGUMENT**

I.   **THE DEFENDANT'S INEFFECTIVE ASSISTANCE CLAIM IS NOT
     RIPE FOR CONSIDERATION ON DIRECT APPEAL**.

### Standard of Review

          This Court ordinarily does not review claims of

ineffective assistance of counsel on direct appeal.  Such

claims are reserved for collateral proceedings pursuant to

28 U.S.C. § 2255, when the record for such claims may

properly be developed.  Massaro, 538 U.S. 500; Thornton, 327

F.3d at 271-72.  There is a very narrow exception to this

rule where the existing record establishes actual

ineffectiveness.  Headley, 923 F.2d at 1083.


### Discussion

          Defendant/appellant William King's sole argument

on this appeal is that his counsel was ineffective for

failing to move to suppress certain evidence.  The

defendant's ineffective assistance of counsel claim is not

ripe for consideration on direct appeal because the present

record is insufficient for the Court meaningfully to review

this claim.  It should instead be raised in a collateral

-23-

proceeding brought under 28 U.S.C. § 2255, where a further
evidentiary record may be developed.

The Supreme Court has expressed a preference for
litigating ineffective assistance of counsel claims through
a collateral proceeding rather than on direct appeal.
Massaro, 538 U.S. at 504.  A collateral proceeding, the
Supreme Court held, allows the claim to be litigated first
in the district court, "the forum best suited to developing
the facts necessary to determining the adequacy of
representation during an entire trial."  Id.  The Supreme
Court further noted that the trial judge, having observed
all of the prior proceedings in the case, would have an
"advantageous perspective" for evaluating the overall
effectiveness of trial counsel.  Id.

This Court has long adhered to such a practice.
See Thornton, 327 F.3d 268; United States v. Jake, 281 F.3d
123, 132 n.7 (3d Cir. 2002).  In Thornton, the government
conceded on direct appeal that defense counsel's performance
was deficient, but, citing extensively to the Supreme
Court's opinion in Massaro, this Court nonetheless declined
to consider the ineffective assistance of counsel claim on

-24-

direct appeal.  Noting that "[i]t has long been the practice of this court to defer the issue of ineffectiveness of trial counsel to a collateral attack[,]" this Court ultimately denied the claim of ineffective assistance of counsel without prejudice to the appellant's right to raise the claim on collateral attack.  Thornton, 327 F.3d at 272.

Here, unlike in Thornton, the government does not concede any aspect of the ineffectiveness test.  To the contrary, the record as it presently stands supports the view that counsel acted within professional norms and that the defendant did not suffer prejudice.  The defendant claims that his counsel was ineffective for not moving to suppress evidence obtained from the defendant's home computers, which computers were searched after the defendant's wife gave written consent for that search.[1]

---

[1] Of course, in this case, unlike the cases relied on by King, the agents conducting the search at the defendant's home had a valid warrant.  At least once King's wife told the agents that there was medical billing information on the computers, the computers may have become searchable under the warrant, see United States v. Giberson, 527 F.3d 882, 888 (9th Cir 2008) (even when computers are not expressly covered by the warrant, "[i]f it is reasonable to believe that a computer contains items enumerated in the warrant, officers may search it."), and, if Mrs. King had not
(continued...)

Based on the shifting testimony presented by his wife at trial, during which she seemed to assert that she consented because she understood that the search warrant included the computers, Supp. App. 1282, and, separately, that she thought that the "consent to search" form she signed was an inventory, Supp. App. 1331, King argues that there was a basis to believe that consent was not validly obtained and freely given, and therefore to move to suppress the evidence from the computers.  The defendant then goes on to assert that counsel's failure to move to suppress amounted to ineffective assistance of counsel.  The defendant's argument begs numerous questions, all of which require the development of a factual record.

For example, the defendant's argument assumes that trial counsel knew, in advance of trial, what the defendant's wife would say about the consent.  However, there is no evidence about how or when defense counsel would have been apprised of Mrs. King's version of the events.  It

---

[1](...continued)
consented, the agents could certainly have held the computers pending acquisition of an additional warrant separately authorizing the search of the computers.

-26-

is unclear from the record when the defendant's trial
counsel had access to Mrs. King.  From the colloquy that
occurred before Mrs. King took the stand in her husband's
defense, the record establishes that during the
investigation, Mrs. King had retained separate counsel and
had refused to testify on Fifth Amendment grounds.  Supp.
App. 1254-57.  See also Supp. App. 1250-51 (prosecutor
discusses contact with Mrs. King's counsel before trial).
It is not clear from the record whether she was cooperating
with her husband's defense team during that period, or when,
before her testimony, she began to cooperate with his team,
if at all.[2]

        Indeed, it is unclear if the defendant's wife was,
by the time she took the stand for the defendant, clear
about her own version of events.  On direct examination,
Mrs. King never actually asserted that she was, or that she
felt, tricked, into signing the consent form.  Rather, she

---

[2]    In the context of discussions about exhibits that
defense counsel planned to introduce through Mrs. King,
defense counsel represented that it was only after the
government had rested, before Mrs. King's testimony, that
defense counsel was able to complete the exhibits that Mrs.
King was to testify about.  Supp. App. 1253.

testified that she was shown a document that she thought was a search warrant, and based on her review of that document, she agreed to "let [the agents] search my home and to search my computers." Supp. App. 1282. It was not until cross-examination, when her efforts to talk over the prosecutor were becoming frustrated, that she claimed that she was "tricked" into giving consent by being told that the consent form was necessary "for inventory purposes." Supp. App. 1331.[3]

Based on this nebulous record, King somehow asserts to this Court, as a settled fact, that Mrs. King was tricked and that her consent to search the computers was not voluntary. Br. 19-20. He even cites a raft of cases

---

[3] Before Mrs. King testified, defense counsel did begin his cross-examination of Postal Inspector Ryan by suggesting, through his questions, that the agent had not provided Mrs. King with her "rights," and, early on, asked whether Mrs. King had "thought you deceived her," Supp. App. 1124, and whether the agent had "tricked" Mrs. King into believing that the agents had authority to search the computers. Id. This was firmly denied by the agent. Id. While this line of attack might suggest that defense counsel had conferred with Mrs. King by that date, it certainly does not prove that, especially since a similar line of attack had been used at the suppression hearing with respect to the defense motion to suppress statements made by the defendant to another agent. Supp. App. 244-45, 256.

involving various government ruses which courts held resulted in involuntary consent. Br. 16-19. But the government adamanantly denies, consistent with Inspector Ryan's testimony, that there was any inappropriate deception here, and the trial court has never addressed this factual issue. This is plainly not a case in which a new claim of ineffectiveness may be considered on direct appeal.

In addition, the defendant's argument necessarily assumes, and he therefore asserts, that there is no conceivable reason why trial counsel might have decided that presenting a motion to suppress the computer evidence was not in his client's best interests, if, indeed, counsel knew what Mrs. King's version of events would be. Br. 20-23. The defendant's self-serving lack of imagination in this regard, however, does not create a record for this Court.

The record is devoid of evidence as to what reasons, if any, tactical or otherwise, defendant's trial counsel had in not presenting the district court with a motion to a suppress the computer evidence. Perhaps defendant's trial counsel understood that he would lose the suppression issue, especially in light of Mrs. King's

extensive education and general demeanor - which belied any naivete or a retiring character – and made the calculated decision to instead use her allegations to "dirty up" the agents with the jury.  See, e.g., United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) (defense counsel not required to press meritless claims).  Or perhaps defendant's trial counsel decided that there would be a strategic advantage if he were able to "spring" the issue on the government, and hope that agents unprepared for the issue would contradict one another before the jury.

Since the record contains no information on this issue, it certainly cannot be said to be complete, the defendant's assertions notwithstanding.  Indeed, especially because, in evaluating trial counsel's conduct for claimed ineffectiveness, "[j]udicial scrutiny of counsel's performance must be highly deferential," and the courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, the need for a record to be made about defense counsel's failure to file a

motion is very clear.  The issue of trial counsel's alleged ineffectiveness is plainly not ripe on direct appeal.

Finally, the conclusion that King's new claim satisfies the second prong of the <u>Strickland</u> test, regarding prejudice, is even more tenuous.  At this stage, if any conclusion may be reached at all, it is that King was not prejudiced, because he would have been convicted even without the computer evidence.  That fact is discussed in the next section of this brief.  In <u>Thornton</u>, this Court made clear that "the issue of prejudice is also best decided in the first instance in a collateral action rather than on direct review."  327 F.3d at 272.  As the <u>Thornton</u> Court explained, the district court is best suited to make this assessment in the first instance.  For all of these reasons, it is clear that King's ineffectiveness claim should not be considered at this time.

II.  IN LIGHT OF THE POOR QUALITY OF THE EVIDENCE SUPPORTING
     SUPPRESSION OF THE COMPUTER EVIDENCE AND THE
     OVERWHELMING EVIDENCE OF GUILT WHICH IS INDEPENDENT OF
     THE COMPUTER EVIDENCE, THE DEFENDANT CANNOT BE SAID TO
     HAVE SUFFERED PREJUDICE FROM THE ADMISSION OF THE
     COMPUTER EVIDENCE.

### Standard of Review

        Under Strickland, 466 U.S. 668, to establish

ineffective assistance of counsel, a criminal defendant must

show both that the counsel's conduct was deficient (i.e.,

"outside the wide range of professionally competent

assistance"), id. at 690, and that the deficiency resulted

in prejudice to the defense (i.e., "there is a reasonable

probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different"),

id. at 694.  In judging counsel's conduct, "[j]udicial

scrutiny of counsel's performance must be highly

deferential," and the courts "must indulge a strong

presumption that counsel's conduct falls within the wide

range of reasonable professional assistance."  Id. at 689.

In demonstrating prejudice, it is "not enough for the

defendant to show that the errors had some conceivable

effect on the outcome of the proceeding."  Id. at 693

(citation omitted).  Instead, "[t]he defendant must show

-32-

that there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the
proceeding would have been different."  Id. at 694; Deputy
v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994).  A reasonable
probability means a probability "sufficient to undermine
confidence in the outcome."  Strickland, 466 U.S. at 694.
Thus, the gravamen of the Strickland inquiry is "whether,
despite the strong presumption of reliability, the result of
the particular proceeding is unreliable because of a
breakdown in the adversarial process that our system counts
on to produce just results."  Id. at 696.


## Discussion

        Even if the issue were ripe on direct appeal, and
even if defendant's trial counsel should have moved to
suppress the computer evidence, the defendant cannot
establish that he was prejudiced by trial counsel's failure
to make that motion.  This is so because the motion would
have been denied, and also because even if the motion were
successful, the evidence of the defendant's guilt
independent of the computer evidence was so overwhelming

-33-

that he would have been convicted without the computer evidence.

Under Strickland, to establish ineffective assistance of counsel, a criminal defendant must show not only that his counsel's conduct was "outside the wide range of professionally competent assistance," id. at 690, but also that that deficiency resulted in prejudice to the defense, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  In the context of an allegation that a failure to move to suppress evidence constitutes ineffective assistance, the defendant alleging prejudice must show that he would likely have prevailed on a motion to suppress, and that, having prevailed, there is a reasonable likelihood that he would not have been convicted.  Thomas, 428 F.3d at 502.  King can make neither of these showings in this case.

There is no rational basis to believe that, if the defendant's trial counsel had moved to suppress the computer evidence, that motion would have been successful.  King assumes that his motion would have been granted, but does

-34-

not provide any basis for that assumption.  Instead, King

appears to accept, at face value, the assertions his wife

made at trial, see Br. 20 ("because Postal Inspector Ryan

made material misrepresentations . . ."), and ignores the

parts of the record in which his wife's descriptions of

events are refuted.[4]  Furthermore, in assuming that his

motion would have been granted, the defendant even ignores

the "critical factors" listed in one of the cases he himself

cites, to wit, "the setting in which the [search] consent

was obtained, the parties' verbal and non-verbal actions,

and the age, intelligence, and educational background of the

consenting [party]."  United States v. Crandell, 554 F.3d

---

[4]  For example, on direct examination, Inspector Ryan
clearly testified that at the outset of their encounter,
Mrs. King was shown a copy of the search warrant, Supp. App.
1058, and then Mrs. King showed the agents where relevant
records were kept, id.  When the agents observed computers
in the house, Mrs. King told the agents that the computers
had billing records on them.  Id.  Mrs. King was then asked
for permission to copy the computers, which she gave.  Supp.
App. 1060.  She also agreed to an interview.  Id.
Subsequently, once the defendant had arrived on the
premises, and asked her why she was talking to the agents,
Mrs. King became less cooperative.  Supp. App. 1121.  At
that point, Mrs. King refused to sign the inventory receipts
for what the agents were taking, except for the receipt for
the computer that could not be copied on site.  Supp. App.
1122.

79, 88 (3d Cir. 2009), quoting United States v. Wilson, 413 F.3d 382, 388 (3d Cir. 2005).  As the record below makes clear, each of these factors would militate against a finding that consent in this case was not voluntary, since the consent was obtained from Mrs. King in her own home, Supp. App. 1059-60, none of the agents threatened her, Supp. App. 1171, the consent was written and specifically advised her of her right to refuse, Supp. App. 1165-68, and Mrs. King is a mature woman who is both intelligent and extremely well-educated.  Supp. App. 1254, 1259-60, 1310.  As such, the defendant has fallen woefully short of the requirement that he show that his motion would likely have been successful.

The defendant also fails to make the required showing of prejudice, in that he cannot show that without the computer evidence there is a reasonable likelihood that he would not have been convicted.  In fact, in light of the overwhelming evidence of the defendant's guilt independent of the computer evidence, it is clear from the record that the defendant would have been convicted even without that evidence.

-36-

The defendant repeatedly emphasizes the importance of the computer evidence, and seeks to paint it as critical to the government's case.  This effort overlooks the devastating evidence from sources other than the computers which proved the defendant's guilt.  King, for example, argues that the computer evidence was "strong circumstantial evidence of Dr. King's guilt and his efforts to cover up misconduct," Br. 24, and that it "showed a deliberate pattern by Dr. King to cover up his fraudulent activities."  Id.  These statements are certainly true, but the computer evidence was by no means the only, or even the best, evidence of the defendant's guilt, mental state, and efforts to cover up his fraud.[5]

---

[5]  King also argues that the computer evidence "was key evidence in the Government's case to support its claims that Dr. King was 'upcoding' and submitting claims for 'ghost visits.'"  Br. 23.  This clearly overstates the role of the computer evidence.  In fact, the computer evidence had little bearing on the issues whether the defendant billed for more complex services than he provided ("upcoding") or billed for visits that never happened ("ghost visits").  Rather, the primary evidence that the defendant upcoded was the testimony of the nurses and patients about why the patients saw the defendant, and how long the visits lasted.  Further evidence of the upcoding came from the evidence of the requirements for billing that code, the frequency with which the defendant used the code, and the impossibility of
(continued...)

-37-

Illustrative of the defendant's overemphasis of the significance of the computer evidence is the defendant's assertion that if the evidence had been suppressed, "the Government would have had to prove that Dr. King created the false medical records based solely on the observations of IBC auditors, with no documentation to support this contention."  Br. 25.  This assertion is plainly untrue, as the trial record amply demonstrates.  To prove that the records were falsified, the government called not only the Blue Cross auditors who were experienced nurses and who had immediately noticed the suspicious nature of the fake files, but also the nurses who had worked with the defendant and the patients' true medical records every day.  These nurses testified that the true medical records were one page long, and contained handwriting in addition to the defendant's. They also testified that the three-page records provided by

---

[5](...continued)
some of the defendant's days if the code used was the proper one.  The evidence that the defendant billed for ghost visits came from the medical and billing records seized, in hard copy, from the defendant's office and home.  The evidence of the defendant's mental state came from numerous sources, including his lies to the FBI case agent and his efforts to get his former mistress and nurse to lie to the FBI for him.

the defendant to the auditors were not records they used in the medical practice, although the writing thereon was the defendant's.

The government's proof that the records were falsified also came from a number of patients, who were familiar with the real records (these patients described and identified the true one-page medical form used by the practice, denied the handwriting on the documents supporting "ghost visits" as their own, and denied some of the particulars about their own condition, history, and treatment as described in the fake records), and another physician from the same practice (who identified the true medical form and disclaimed the fake form). In addition, the government had the testimony of the Blue Cross investigator who secured two real files (which contained the real one-page forms and none of the fake three-page forms) and the testimony of the case agents, who reviewed all of the medical records seized in the search of the defendant's office and found none of the three-page forms in those records. Supp. App. 1082, 1191-92.

Supporting all of this testimony, of course, were the records themselves, which, at base, consisted of two distinct sets: the authentic one-page medical records for most patients, see, e.g., Supp. App. 215, and the pristine three-page medical records for the ten patients whose records the defendant produced to Blue Cross, see, e.g., Supp. App. 212-14. In short, even if the three-page template had not been found on the defendant's home computer, the evidence would have proven beyond any reasonable doubt that the defendant created fake, three-page medical records for each of the ten patients' visits, which he then provided to the Blue Cross auditors.

As the record makes clear, the government would have easily satisfied its burden of proof with respect to every element of each of the crimes without the computer evidence. Accordingly, the defendant cannot make the requisite showing of prejudice under Strickland.

## CONCLUSION

For the reasons stated above, the government respectfully submits that the defendant's appeal should be dismissed, and the judgment of the district court below should be affirmed.

Respectfully submitted,

**MICHAEL L. LEVY**
**United States Attorney**


**/s Robert A. Zauzmer**
**ROBERT A. ZAUZMER**
**Assistant United States Attorney**
**Chief of Appeals**
**Pa. Bar No. 58126**


**/s Bea L. Witzleben**
**BEA L. WITZLEBEN**
**MAUREEN MCCARTNEY**
**Assistant United States Attorneys**
**Pa. Bar No. 45432**


**United States Attorney's Office**
**615 Chestnut Street, Suite 1250**
**Philadelphia, PA  19106**
**(215) 861-8680**

## CERTIFICATION

1.  The undersigned certifies that this brief contains 6,862 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2.  I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by ScanMail Real-Time Scan Monitor, version 3.82, by Trendmirco, and found to contain no known viruses.  I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

/s Bea L. Witzleben
BEA L. WITZLEBEN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served

on the Filing User identified below through the Electronic

Case Filing (ECF) system:

Michael P. Lytle, Esq.
Warnken, LLC, Attorneys at Law
300 E. Joppa Road, Suite 303
Towson, MD  21286


/s Bea L. Witzleben
BEA L. WITZLEBEN
Assistant United States Attorney


DATED:  November 2, 2009.